WOOTEN (VINING v.). See Case No. 16,949.

---

## Case No. 18,042.

### WOPE et al. v. HEMENWAY.

[1 Spr. 300; [1] 18 Law Rep. 390.]

District Court, D. Massachusetts. July, 1855.[2]

SHIPPING ARTICLES—CONSTRUCTION—DESCRIPTION OF VOYAGE—IMPRISONMENT OF SEAMEN.

1. If a clause in shipping articles is ambiguous, or susceptible of two constructions, one favorable and the other unfavorable to the seamen, the construction favorable to the seamen shall be adopted, it not being their fault that the owners did not make the articles clear.

[Cited in Goodrich v. The Domingo, Case No. 5,543; The Quintero, Case No. 11,517; The Samuel Ober, 15 Fed. 622.]

2. In a shipping paper, the words, "voyage from Boston to Valparaiso or other parts of the Pacific Ocean, at and from thence home direct, or via ports in East Indies or Europe," do not describe a voyage with sufficient certainty within the United States statutes, for the protection of seamen, and do not bind the seamen to service after arrival at Valparaiso.

[Cited in The Gem, Case No. 5,304.]

3. If seamen, from an honest mistake of their right to a discharge, peacefully refuse labor, it will not justify their imprisonment on shore.

[3] [This was a case for seamen's wages. Libellants were respectable men, natives of Sweden, were going to California, and had partly engaged a direct passage to San Francisco. A shipping master from Mr. Hemenway called at their boarding house in Boston, and offered them wages to go to Valparaiso in the ship Loo Choo, as seamen. He told them they had better earn wages to Valparaiso, and they could always easily get a passage from Valparaiso to San Francisco. Libellants went and looked at the ship and her accommodations, and after conferring together, concluded to go in her. Upon returning to the boarding house, the shipping

master produced the shipping paper for them to sign. The men hesitated, and refused to sign unless a stipulation should be put in that they should be discharged upon arrival at Valparaiso. The shipping master told them that they were green; that they would be discharged there. They replied they knew they were green, but they feared difficulty if the articles did not express the agreement. The shipping master then said he would write it in the articles if that would satisfy them, and taking a pen he wrote upon the paper, when they signed it, joined the vessel, and continued on board till her arrival at Valparaiso. In the meantime, there was mutual good feeling and satisfaction in every particular between the officers and these men. Having moored the ship, and made everything snug on board in the harbor of Valparaiso, they packed up their clothes, dressed themselves, and asked (as the chief mate said) respectfully to be discharged and paid off. The captain refused to discharge them. They reminded him that such was their agreement, and referred him to the articles. The captain produced the articles, and the seamen pointed out to him the clause (against these six seamen's names) to which they had alluded, which was discovered to read thus: "Monthly 14, and to have $15 if he perform the voyage and return in the ship to Boston." But the captain finally decided that he would not discharge them. The seamen asked to see the consul. The captain went and brought to them the consul's clerk, the consul being absent, who read the articles to the men; and when he came to this clause he said, "Captain, I can do nothing with these men; you have got two rates of wages in the alternative on your articles." Yet, he said, the captain had power to discharge them if he would. After declining to do anything officially, he told the men they had better continue with the ship; but they refused, and the captain refused to discharge them. The clerk then asked the captain if he could be of any service to him, and what he was going to do with the men, and the captain asked the clerk to get them put in prison for him. The seamen, persisting in refusing further duty on board, were committed to prison without being allowed to take any change of clothes. They were kept in prison thirty-five days,—one day each in solitary confinement in separate cells, and thirty-four days in a prison room about thirty feet long and twenty feet wide, having two grating windows, besides a grating door, its only passage for air and light. Here they were incarcerated thirty-four days, in company with all sorts of criminals, afflicted with various and loathsome diseases, numbering never less than one hundred, and part of the time over two hundred, crowded into the same room so thickly as to be unable part of the time to lie down, and having no berths, beds, nor bedding. The food consisted of bread,

1 [Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

2 [Affirmed in Case No. 13,149.]

3 [From 18 Law Rep. 390.]

and a peculiar mixture of Chili beans, peas, barley, and Chili pepper, etc., mixed up together. Once a day, each morning, each seaman was served with bread, equal to a sea biscuit in quantity, with water, and nothing else. And once a day, each evening, the pepper mixture was served out in little iron kettles, holding about a gallon each. One of these kettles full was allowed to ten prisoners, and nothing else. Nothing to eat with but their hands, nor anything else with which to scoop it out of the kettle. The Chili pepper mixture was perfectly unpalatable to the libellants, who abstained from eating it until they found the allowance of bread alone insufficient to sustain life; and as soon as they did eat the said Chili pepper mixture, all but one of libellants became sick, two of them prostrated with sickness for days, and swelled up, and unable to rise up at all. They were not able to get an interview with the consul while in prison, and no interview with the captain till a day or two before they were taken out, when the captain called for a moment at the grating and spoke to one of them, but left before the others could make their way to the grating. At the expiration of thirty-five days the libellants were taken out of prison, and put on board the vessel. They were then covered with vermin. They asked to see the consul himself, who was then at home, but were refused; and, still refusing to go in the vessel, three of them were put in irons, with arms suspended above a span around a stanchion between decks, and deprived of food about thirty-six hours, when they consented to turn to, and thence they continued faithfully at service until the vessel arrived in Boston, submitting to perform their duty to the entire satisfaction of the officers during the remainder of the voyage. As to the aforesaid clause in the articles on which the seamen relied, as providing for their discharge at Valparaiso, the defendant produced his shipping master, who swore that he wrote that clause in one set of the articles in Mr. Hemenway's office, by the special direction of Mr. Hemenway, and that this was so written on the articles over the seamen's names, after they had signed the same articles, and had gone aboard the vessel. It further appeared in evidence from the articles that the voyage therein described was in these words: "Voyage from Boston to Valparaiso and other ports in the Pacific Ocean, at and from thence home direct or via ports in the East Indies or Europe."] [3]

C. G. Thomas, for libellants.
William Delion, for respondents.

SPRAGUE, District Judge. This is a libel for seamen's wages on a voyage from Boston to Valparaiso and back. That the services were rendered is not denied. But the defendant insists that deduction should be

[3] [From 18 Law Rep. 390.]

made for the expenses of the imprisonment of the libellants at Valparaiso. The libellants contend that the imprisonment was unlawful, and they present three distinct grounds of illegality: (1) That by the express agreement made at the time they shipped, they were to be discharged at Valparaiso. (2) That the shipping articles do not describe the voyage as required by the laws of the United States, and the master had no right to detain them after arriving at Valparaiso. (3) That even if the master had a right to detain them, he had no right to imprison them on shore, in a foreign country.

1. What was the contract, when these men shipped at Boston? Six witnesses swear positively that the contract was, that the libellants should be discharged at Valparaiso, and that when the shipping articles were signed, they insisted that an entry of that fact should be made upon them, and that the shipping master then wrote something upon the articles, which he said would show their right to such discharge. Against this there is only one witness, the shipping master himself, who denies that there was any such agreement.

In weighing this testimony, it is to be considered that five of the witnesses for the libellants are seamen, having an interest in this question, and swearing for each other; and their testimony is to be closely scrutinized, and received with great caution; but, upon the strictest scrutiny, they have testified with great consistency, with apparent frankness, and more than ordinary intelligence for men of their class. The other witness for the libellants was a landlord, with whom they boarded at the time they shipped. He may have sympathy for the libellants, but does not appear to have any interest to bias his testimony.

The sole witness for the respondent is his agent, the shipping master. His conduct is in question, and his explanation of an entry made by him, on the shipping articles, is not satisfactory. His testimony would not outweigh that of the landlord alone. But, beside this, there are two circumstances that go to corroborate the testimony of the libellants' witnesses.

The first is, that, after having fully and faithfully performed their duty, until the arrival of the ship at Valparaiso, they at once confidently claimed their discharge, as a matter of right, which being refused, they immediately referred to the shipping articles, then in possession of the master, as showing their right to be discharged. These articles they had never seen after they were signed, and yet instantly and confidently appealed to them, as decisive in their favor.

The other circumstance is the unusual entry which is found on the articles, upon their production. These articles were prepared by the shipping master for the officers and the rest of the crew, as well as for the libellants. In the usual column, against the

names of the seamen, were the figures "14," as their monthly wages, and opposite to their names, in the blank space, was made this entry: "To have $15 per month, if he performs the voyage in the ship and returns to Boston." That entry is a part of the written contract. It contains a condition, "if he shall perform," &c.

The respondent insists that the contract was absolute. If so, why was this condition written upon the articles? The entry was made by the respondent's agent, in such language as he chose to adopt. It was made for the purpose of satisfying the seamen that they would be discharged at Valparaiso, and if the shipping master did not intend that it should express that right, it was a fraud upon them. He might have made it in language clear and explicit. If he has not done so, but left it ambiguous, the seamen are not to be prejudiced by such ambiguity. Upon the whole evidence, it is satisfactorily shown that the seamen were entitled, by contract, to their discharge at Valparaiso.

2. As to the second ground, viz., the insufficiency of the articles. The description of the voyage is as follows. "From Boston to Valparaiso or other parts of the Pacific Ocean, at and from thence home direct, or via ports in East Indies or Europe."

This description is not sufficiently definite. It gives to the owner and master of the vessel, such a power over the seamen, as is inconsistent with the provisions of the statutes of the United States, intended for their protection; and, for that reason, the seamen would not have been bound by the articles to any service after arriving at Valparaiso. On both these grounds, therefore, any coercion of the master to compel the performance of duty at Valparaiso was illegal.

3. But even if the seamen had mistaken their right, and were bound to perform duty, the master had no right to send them to a prison on shore, and especially to such a prison. These men merely claimed their discharge, and refused further labor, on the ground of right. They did so peacefully and respectfully; there were no threats or intimations of force; if it was necessary to restrain or imprison them, it should have been done on board of the vessel, as it might have been, without danger, and where they would have been under the eye of their own officers. In such case, the law does not allow the master to thrust his men into a foreign jail, and there expose them to all the privations, sufferings, and hazards of disease. Upon all these grounds, the imprisonment of the libellants was unlawful, and they cannot be required to pay the expense of such imprisonment.

Decree for the libellants.

After the decision of the above libel for wages, six suits by the libellants against the master, for the unlawful imprisonment were tried, and an opinion was pronounced by the court in favor of the libellants; and, the defendant having stated that he should take an appeal therefrom, the libellants' counsel said that, as to one of them, he would ask for a decree of only $50, because his client was unable further to litigate, and a decree for that amount only was rendered for that libellant, and an appeal in that case refused. As to the others, the appeal was allowed.

The decree was affirmed upon appeal. See Snow v. Wope [Case No. 13,149]. That any ambiguity, uncertainty or obscurity in the articles, is construed most favorably to the seamen, see Jansen v. The Theodor Heinrich [Id. 7,215]; The Hoghton, 3 Hagg. Adm. 111. As to imprisonment of seamen in foreign gaols, see The Mary [Case No. 17,823]; Gardner v. Bibbins [Id. 5,222.]